# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

### CENTRAL DIVISION



FILED
OCT 09 2012

******************************************************************************************

| | |
|---|---|
| UNITED STATES OF AMERICA, | * CR. 12-30051-RAL |
| Plaintiff, | * |
| -vs- | * REPORT AND RECOMMENDATION |
| | * CONCERNING MOTION TO SUPPRESS |
| LEON DONALD FARLEE, | * |
| Defendant. | * |

******************************************************************************************

## SUMMARY

A 62-year-old man was badly beaten in a trailer on the Cheyenne River Indian Reservation. Leon Farlee was the prime suspect. Following his arrest on an unrelated matter, Farlee made statements to a tribal officer. Officers later searched, and seized evidence from, the trailer. They also obtained other evidence, including blood from his boots and swabbings from his mouth. After being indicted on assault charges, Farlee moved to suppress his statements and the physical evidence in police custody on Fourth and Fifth Amendment grounds. Because exclusion is not required for most of this evidence, and because the admissibility and use of the remaining evidence is no longer an issue that needs to be decided, the Court recommends that the suppression motion be denied.

## FACTUAL BACKGROUND

At approximately 11:00 p.m. on March 31, 2012, the Cheyenne River Sioux Tribal Police Department, responding to a 911 call, went to Leslie Oakie's trailer in Eagle Butte, South Dakota. There they found Merton Eaton lying on the floor unresponsive. Eaton had multiple facial and head injuries, severe enough that he had to be air lifted to, and treated in the intensive care unit at, Rapid City Regional Hospital. While investigating, police discovered what they believed was blood on a broken window and on the floors throughout the interior of the trailer. This information was then passed on to Russell Leaf, a tribal detective.

Later in the night, Jeremi Blacksmith, a police officer for the Tribe, was dispatched to Alvina Circle Bear's residence. When he arrived, Circle Bear said that she wanted Farlee removed from her home. Farlee at the time was not wearing a shirt and had an ace bandage on his right forearm. While Blacksmith was talking to Farlee, Officer Mark Aungie, who had just shown up, informed Blacksmith that there was a "pick up and hold" order on Farlee. Blacksmith then placed Farlee under arrest and proceeded to handcuff him. While doing so, Farlee told Blacksmith to "watch out for my arm." In response, Blacksmith asked Farlee what happened to his arm and Farlee replied that he had cut it on a wire panel fence outside the residence. After trips to both the tribal jail and the IHS Hospital (because of issues relating to his arm and the need for medical attention), Farlee was ultimately lodged in at the jail.

At some point after learning of the Eaton incident, Leaf went to Oakie's trailer, made various observations and determined that blood samples from it should be taken. He subsequently contacted Oakie to obtain consent from her to enter the trailer and collect evidence. She agreed to meet Larry LeBeau, another tribal detective, at the trailer on April 3, 2012.

Before meeting Oakie, LeBeau took blood samples from the exterior of the trailer. He also sought and obtained a search warrant from a tribal judge for Farlee's boots, which jail personnel had possession of by virtue of Farlee's incarceration. The boots were believed to contain blood that police wanted to swab and have tested.

Shortly after 4:00 p.m. that same day, Oakie appeared, and signed a permission to search form just outside her trailer. Her aunt and uncle, who had accompanied her, then opened the door to the trailer and LeBeau entered. Inside, he took blood samples and photographs and seized a knife that he found in one of the bedrooms.

The next day, LeBeau secured two buccal samples from Farlee pursuant to a tribal search warrant. Farlee was still in custody when this took place.

Eventually, a federal jury indicted Farlee on two counts of assaulting Eaton (with a deadly weapon (shod feet) and causing serious bodily injury). He thereafter moved to suppress his statements to Blacksmith and certain physical evidence in the possession of tribal police, maintaining that his rights under the Fourth and Fifth Amendments were violated.

# POST-ARREST STATEMENTS

Farlee initially claims that the statements he made, following his arrest, should be suppressed because they were obtained in violation of *Miranda* and were involuntary. He contends that Blacksmith subjected him to custodial interrogation without first being given *Miranda* warnings and that his statements were not of his own volition "due to physical limitations under which [he] was suffering" from at the time.[1]

## A. Interrogation

*Miranda* warnings are required "not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."[2] "Interrogation" as conceptualized in *Miranda,* "refers not only to express questioning, but also to any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."[3] "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation."[4] But interrogation

---

[1] *See* Dkt. No. 19 at 1, ¶1.

[2] *Rhode Island v. Innis,* 446 U.S. 291, 300 (1980).

[3] 446 U.S. at 301.

[4] *Id.*

"extend[s] only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response."[5]

Turning to the facts of this case, the Court concludes that Farlee was not "interrogated" within the meaning of *Miranda*. First off, Blacksmith did not arrest Farlee for committing a crime or on a criminal matter. Nor was Blacksmith even aware, until the next day, that Eaton had been assaulted or that Farlee was a suspect in, or had anything to do with, the assault.[6] Blacksmith therefore had no reason to believe that his question was likely to generate an inculpatory response from Farlee.[7]

Second, Blacksmith's question was intended to determine the nature and extent of Farlee's arm injury and whether Farlee needed medical attention. Such an inquiry is one that a reasonable person in Blacksmith's position would have made given the circumstances present.[8] Because Blacksmith sought to ascertain only what he perceived to

---

[5]*Id.* at 302 (emphasis in the original).

[6]*See Archanian v. State*, 122 Nev. 1019, 1038, 145 P.3d 1008, 1022 (2006), *cert. denied*, 127 S.Ct. 3005 (2007); *Al-Amin v. State*, 278 Ga. 74, 88, 597 S.E.2d 332, 348, *cert. denied*, 543 U.S. 992 (2004); *State v. Vickers*, 159 Ariz. 532, 538, 768 P.2d 1177, 1183 (1989), *cert. denied*, 497 U.S. 1033 (1990); *see generally* 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, *Criminal Procedure*, §6.7(b) at pp. 769-70, (3d ed. 2007).

[7]*See Innis*, 446 U.S. at 301-03.

[8]*See Archanian*, 122 Nev. at 1038, 145 P.3d at 122; *Al-Amin*, 278 Ga. at 88-89, 597 S.E.2d at 348; *People v. Raglin*, 21 P.3d 419, 427 (Colo. App. 2000); *United States v. Robles*, 53 M.J. 783, 790 (A.F. Ct. Crim. App. 2000); *State v. Strayer*, 242 Kan. 618, 624-25, 750 P.2d 390, 395 (1988); *see also Johnson v. State*, 269 Ind. 370, 376-78, 380 N.E.2d 1236, 1240-41 (1978) (no interrogation under *Miranda* when officer asked what happened to defendant who had blood over his face and body); *see generally* 2 LaFave, *Criminal Procedure*, §6.7(b) at pp. 770-71.

be an injury and potential medical problem, and not something related to a crime that he believed Farlee had committed, the procedural safeguards and protections guaranteed under *Miranda* were never implicated.[9]  Indeed, it would be a dangerous precedent to conclude that asking about an arrestee's injuries or medical condition, out of concern and to provide assistance to help ameliorate the same, amounts to interrogation or a form of coercion proscribed by *Miranda*.[10]

In the final analysis, Blacksmith's question did not constitute interrogation for purposes of *Miranda*.  This being the case, there was no requirement that Farlee be Mirandized before making his statement about cutting his arm on a wire fence or any of the gratuitous statements he made afterward.

## B. Voluntariness

In an ancillary claim, Farlee asserts that his post-arrest statements were involuntary because they were made in a coercive environment and at a time when he was suffering from "physical limitations." The record, however, indicates otherwise and provides Farlee with no traction for his involuntariness claim.

The Fifth Amendment prohibits the introduction of involuntary statements at trial.[11] "A statement is involuntary when it [is] extracted by threats, violence, or express or

---

[9]*Id.*

[10]*See Robles*, 53 M.J. at 790.

[11]*See Chavez v. Martinez*, 538 U.S. 760, 769 (2003).

implied promises sufficient to overbear the [suspect's] will and critically impair his capacity for self-determination.[12]

The totality of the circumstances must be considered when determining whether a statement was made voluntarily.[13] Two factors must be focused on in this determination: the conduct of the police and the characteristics of the suspect.[14] The Government bears the burden of persuasion and must prove, by a preponderance of the evidence, that the challenged statement was voluntary.[15]

Here, there is no proof – worthy of belief – that Blacksmith coerced Farlee into making any statements. The record is devoid of any evidence that Blacksmith overstepped his bounds and undermined Farlee's ability to exercise his free will.

Farlee was 39 years old at the time of the arrest and had a high school diploma. He was not threatened, promised, intimidated or punished in any way. He certainly had the ability to resist pressure and did so, both verbally and physically. And he was the one who brought up the subject matter that led to his statement about cutting his arm on a nearby

---

[12]*United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (*en banc*), *cert. denied*, 543 U.S. 1145 (2005); *see also Jenner v. Smith*, 982 F.2d 329, 333 (8th Cir.) (a statement is not involuntary "unless the police extort[ ] it from [the suspect] by means of coercive activity"), *cert. denied*, 510 U.S. 822 (1993).

[13]*See LeBrun*, 363 F.3d at 724; *Wilson v. Lawrence County*, 260 F.3d 946, 952 (8th Cir. 2001).

[14]*See LeBrun*, 363 F.3d at 724.

[15]*See id.; United States v. Astello*, 241 F.3d 965, 966 (8th Cir.), *cert. denied*, 533 U.S. 962 (2001).

fence and to his successive statements. Notably, he was not subject to "a lengthy harangue"[16] of questions and never admitted to doing anything to Eaton.

Farlee's arm injury did not affect, or more importantly, vitiate the voluntariness of his statements. His arm was bandaged at the time and he was not bleeding or in obvious pain. Although he was upset about being arrested, he did not appear to be under distress or in need of immediate medical care. He walked and stood up normally and even managed, at one point, to pull away from Blacksmith and go down to one knee while handcuffed, injuring Blacksmith in the process.

Farlee's statements were voluntary and not the product of coercive or overreaching conduct on the part of Blacksmith or some physical impairment Farlee was suffering from at the time. Considering all of the facts relevant to the voluntariness inquiry and crediting Blacksmith's testimony (including his denials of having roughed Farlee up and yelled at him), the Court is satisfied that the Government has met its burden of proof, by a preponderance of the evidence, that Farlee's statements comported with due process requirements. The statements therefore may be used by the Government in its case-in-chief at trial.

## PHYSICAL EVIDENCE

Farlee also claims that tribal officers illegally seized certain physical evidence, on April 3-4, 2012, and that this evidence should be suppressed under the Fourth

---

[16]*See Innis*, 446 U.S. at 303.

Amendment.[17] The evidence consists of blood samples and a knife, taken from Oakie's house, photographs snapped there, Farlee's boots (including the blood on them) that were confiscated from the jail and two saliva samples scraped from his mouth. He maintains that these items were seized without probable cause.

## A. Blood Evidence, Knife and Photographs

The Government argues that probable cause was not necessary for the seizure of the blood samples, knife and photographs from Oakie's house because LeBeau received consent from Oakie before entering the house. The Government points to the permission to search form that Oakie signed to support its consent argument.[18]

Police may enter and search a person's house with the consent of that person, or another person with common authority over the premises, without a warrant or probable cause, and any evidence discovered through the search may be used at trial unless it is otherwise inadmissible.[19] In order to be valid, however, consent must be given voluntarily[20] and the Government must prove voluntariness by a preponderance of the

---

[17]See Dkt. No. 19 at 1-2, ¶2.

[18]See Dkt. No. 22 at 6, ¶III.

[19]See United States v. Matlock, 415 U.S. 164, 170 (1974); United States v. Spotted Elk, 548 F.3d 641, 652 (8th Cir. 2008), cert. denied, 129 S.Ct. 1658 (2009); United States v. Hinkle, 456 F.3d 836, 840 (8th Cir. 2006).

[20]See United States v. Fleck, 413 F.3d 883, 891 (8th Cir. 2005); United States v. Escobar, 389 F.3d 781, 784 (8th Cir. 2004).

evidence.[21]    Consent is voluntary "if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied."[22]

Here, Oakie, the property owner, had both actual and apparent authority to consent to the search of her trailer and seizure of the blood evidence, knife and photographs. Oakie signed a permission to search form authorizing LeBeau to search the trailer and to remove from it whatever items of property or evidence he deemed pertinent to his investigation.[23]

There is no evidence to dispute that Oakie's consent was anything but voluntary. Leaf called her ahead of time, explained what he wanted to do and she agreed to meet with LeBeau later on at the trailer house. She arrived, signed the permission to search form presented to her and then left after her aunt and uncle (who had come with her) opened the door for LeBeau.

The totality of the circumstances clearly demonstrate that Oakie possessed the authority to consent and did so, freely and voluntarily. Because valid consent had been obtained before any search and seizure were conducted, Farlee cannot succeed in his quest to suppress the blood evidence and knife, or for that matter, photographs taken inside of the trailer.

---

[21]*See Fleck*, 413 F.3d at 891; *United States v. Czeck*, 105 F.3d 1235, 1239 (8th Cir. 1997).

[22]*United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990).

[23]*See* Mot. Hrg. Ex. 1 (Sept. 19, 2012).

## B. Boots and Saliva Samples

Farlee attacks the propriety of the search warrants which LeBeau used to seize and swab the blood on Farlee's boots and to take saliva samples from his mouth. He says that any evidence gleaned from the boots and buccal samples should be suppressed.

Before a search warrant may be issued, the Fourth Amendment requires a showing of probable cause.[24] "Probable cause" is a "fair probability that contraband or evidence of a crime will be found in a particular place."[25] In determining whether probable cause exists, a court must look at the totality of the circumstances.[26] This determination is to be "based upon a common-sense reading of the entire affidavit"[27] and any "reasonable inferences drawn therefrom."[28] The assessment of probable cause is to be made "from the viewpoint of a reasonably prudent police officer acting in the circumstances of the [ ] case."[29] And lest it be forgotten, "probable cause is a practical, factual and non-technical concept [that] deal[s] with probabilities" and must be applied with this in mind.[30]

---

[24]*See United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007).

[25]*Illinois v. Gates*, 462 U.S. 213, 238 (1983).

[26]*See Gates*, 462 U.S. at 230, 234.

[27]*United States v. Seidel*, 677 F.3d 334, 338 (8th Cir. 2012) (*quoting United States v. Sumpter*, 669 F.2d 1215, 1218 (8th Cir. 1982)).

[28]*United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008).

[29]*Seidel*, 677 F.3d at 337 (*citing United States v. Reinholz*, 245 F.3d 765, 776 (8th Cir.), *cert. denied*, 534 U.S. 896 (2001)).

[30]*Seidel*, 677 F.3d at 337-38.

Once probable cause is found to issue a warrant, that finding is to be given great deference by a reviewing court.[31] The court's duty is simply to ensure that the issuing judge had a "substantial basis for . . . conclud[ing] that [the] search would uncover evidence of wrongdoing."[32] "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants."[33]

Farlee's lack of probable cause claim is not wholly without merit as the Government would have the Court believe. What is troubling is that the affidavits, upon which the search warrants were issued, contain conclusory allegations. In both affidavits, LeBeau states that "the investigation revealed" Farlee assaulted Eaton with Farlee's "fist and feet causing life threatening serious bodily injury (head trauma) to [ ] Eaton."[34] These statements do not detail who LeBeau or police talked to or what information they gathered to support the conclusion that Farlee was the perpetrator of the assault. The question though is whether the conclusory nature of LeBeau's statements tainted the issuing judge's finding of probable cause.

---

[31]*See Gates*, 462 U.S. at 236.

[32]*Id.* (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

[33]*United States v. Ventresca*, 380 U.S. 102, 109 (1965) (citation omitted).

[34]Mot. Hrg. Exs. 2, 3.

The subject matter of conclusory allegations in warrant affidavits is not one that has received much attention in court decisions. Perhaps this is because courts have been willing to tolerate a fair amount of leeway to conclusions derived from police investigations.[35] It may also be because of the latitude the United States Supreme Court has given to issuing judges on the probable cause issue.[36] Courts seem to focus on the reliability and trustworthiness of the information source.[37] Thus, an investigating officer working a case who relies on information conveyed to him by fellow officers will be viewed as far more credible than an anonymous tipster or a drug informant.[38]

Although not completely free from doubt or debate, LeBeau's affidavits provided sufficiently reliable information to find probable cause for the issuance of the boots and saliva sample warrants. It can be reasonably inferred that LeBeau and other officers obtained information through witness interviews, reliable sources and corroboration by direct observation that indicated, at least to a fair degree of probability, (1) Farlee assaulted Eaton and (2) evidence of the assault could be found on his boots and in the DNA of his saliva. The issuing judge, who LeBeau had presented search warrants to before, was

---

[35]*See United States v. Reed,* 700 F.2d 638, 641-42 (11th Cir. 1983); *State v. Jaroma,* 128 N.H. 423, 429-30, 514 A.2d 1274, 1278 (1986); *State v. Gilreath,* 215 Neb. 466, 468-70, 339 N.W.2d 288, 291 (1983); *State v. Willits,* 413 So.2d 791, 792-94 (Fla. App. 1982); *People v. Williams,* 42 Colo. App. 58, 59-60, 595 P.2d 692, 693 (1979).

[36]*See e.g. Jaben v. United States,* 381 U.S. 214, 223-25 (1965); *Ventresca,* 380 U.S. 108-11; *Rugendorf v. United States,* 376 U.S. 528, 531-33 (1964).

[37]*See* 2 LaFave, *Criminal Procedure,* §3.5(a) at pp. 270-71.

[38]*See Jaben,* 381 U.S. at 223-24; *see also* 2 LaFave, *Criminal Procedure,* §3.5(a) at p. 271, n. 11.

therefore reasonably justified in accepting LeBeau's judgment of what the police department's investigation "revealed" without there being an enumeration of the information the department had on hand to support his sworn statements.

## C. Good Faith

But even if probable cause for the warrants was lacking, the seizure of the boots, the blood on them and the buccal samples must nonetheless be upheld. The basis for doing so is the "good faith" exception to the warrant requirement announced in *United States v. Leon.*[39]

In *Leon,* the Supreme Court held that the Fourth Amendment exclusionary rule should be modified so as to not bar the use at trial of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a neutral and detached judge, but ultimately found to be unsupported by probable cause.[40] Because the affidavit in *Leon* "provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause,"[41] the Court concluded that the officers' reliance on the judge's "determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion [was] inappropriate."[42]

---

[39]468 U.S. 897 (1984).

[40]*See* 468 U.S. at 905-25.

[41]*Id.* at 926.

[42]*Id.*

LeBeau's reliance on the search warrants was in good faith and objectively reasonable. He legitimately believed that he had valid warrants, or at least, court approved authority, to seize the bloody boots and saliva samples as evidence germane to the assault of Eaton. Nothing would have made a reasonable officer, in LeBeau's shoes, conclude otherwise.

It is important to remember that the Constitution protects its citizens, not by giving them a license to debate the police over the sufficiency of a warrant, but rather, by interposing a neutral and detached judicial officer between themselves and the police. Farlee received the benefit of a judge's impartial evaluations before both search warrants were issued. The seizures authorized by them were supported, at least facially, by probable cause. Suppressing the evidence seized pursuant to the warrants would be a heavy handed remedy out of proportion to any Fourth Amendment transgression that may have occurred.

## OTHER PHYSICAL EVIDENCE

Farlee's suppression motion encompasses other physical evidence that tribal police acquired, including two white T-shirts, red and brown pullover sweatshirts and a plastic bag. He acknowledges though that he has no standing to object to the T-shirts and sweatshirts because the police received them from third parties (Oakie and Circle Bear).[43] To make matters easier, the Government states that it does not intend to use the plastic bag

___

[43]See Dkt. No. 46.

15

as evidence at trial (because it has no evidentiary value).[44] Given the parties' representations, there is no issue or controversy, with respect to this evidence, for the Court to rule on.

## CONCLUSION

Tribal officers did not violate Farlee's Fourth and Fifth Amendment rights or the dictates of *Miranda* so as to require suppression of his statements and the physical evidence gathered from the trailer and from his boots and mouth. He was not subject to interrogation after being arrested and his statements to Blacksmith were voluntary. The evidence collected from the trailer was done with the owner's consent. And the blood evidence (taken from Farlee's boots) and buccal swabs were authorized by search warrants that LeBeau had a reasonable (good faith) basis to believe were valid. Other physical evidence, originally included as part of the suppression motion, need not be addressed because Farlee admits he has no standing to object to some of it and because the Government has agreed not to use the rest of the same at trial.

## RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Farlee's Motion to Suppress[45] be denied.

---

[44]*See* Dkt. No. 47.

[45]*See* Dkt. No. 19.

## NOTICE

An aggrieved party must file written objections, within 14 calendar days, to challenge this report before the assigned United States District Judge.[46]

Dated this 9ᵗʰ day of October, 2012, at Pierre, South Dakota.

**BY THE COURT:**

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

---

[46]*See* 28 U.S.C. §636(b)(1).