UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

*******************************************************************************

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR. 12-30051-RAL |
| Plaintiff, | * | |
| | * | OPINION AND ORDER ADOPTING |
| -vs- | * | REPORT AND RECOMMENDATION |
| | * | AND DENYING MOTION TO |
| LEON DONALD FARLEE, | * | SUPPRESS |
| Defendant. | * | |

*******************************************************************************

## I. INTRODUCTION

After being indicted for one count of Assault with a Dangerous Weapon and one count of Assault Resulting in Serious Bodily Injury, Defendant Leon Donald Farlee filed a Motion to Suppress, Doc. 19, seeking to preclude admission at trial of statements Farlee made to Tribal Police Officer Jeremi Blacksmith and certain evidence seized by tribal law enforcement officers after Farlee's arrest. Doc. 29 at 1. Magistrate Judge Mark Moreno held a hearing on September 19, 2012, and heard testimony from the Cheyenne River Sioux Tribal Police Detectives Russell Leaf and Larry LeBeau as well as from Officer Blacksmith. On October 9, 2012, Judge Moreno issued a Report and Recommendation, Doc. 48, recommending that Farlee's Motion to Suppress be denied. The Report and Recommendation was served upon the parties as required by 28 U.S.C. § 636 and Farlee timely objected, Doc. 51.

In considering a magistrate judge's recommendation on a dispositive matter, such as a motion to suppress evidence, a district court must make a "de novo determination of those portions of the

-1-

report or . . . recommendations to which objection is made." 28 U.S.C. § 636(b)(1). This Court has conducted a de novo review of the record. For the reasons explained below, this Court adopts the Report and Recommendation with certain qualifications.

## II. FACTS

Around 11:00 p.m., on March 31, 2012, Cheyenne River Sioux Tribal Police Department Officers, in response to a 911 call, went to Leslie Oakie's trailer in Eagle Butte, South Dakota, which is within Indian country on the Cheyenne River Sioux Tribe's Reservation. Doc. 22-4 at 1. Tribal police officers found Merton Eaton lying on the Oakie trailer's floor with multiple facial lacerations and head injuries. Doc. 22-4 at 1. Eaton's injuries were severe and he was air-lifted to Rapid City Regional Hospital for treatment. Doc. 22-4 at 1.

Later that night, Officer Blacksmith responded to a separate, unrelated call from Alvina Circle Bear's trailer. T.[1] 44. Ms. Circle Bear wanted Farlee removed from her home. T. 44. Officer Blacksmith found Farlee with Leslie Oakie in Ms. Circle Bear's kitchen. T. 45. While Officer Blacksmith was talking with Farlee, Tribal Police Officer Mark Aungie ran a warrant check on Farlee and discovered a hold out against Farlee. T. 47, 58. Officer Blacksmith arrested and handcuffed Farlee based on that hold. T. 48. While being handcuffed, Farlee told Officer Blacksmith to watch out for his arm injury. T. 48. Farlee had an ace bandage wrapped around his right forearm, but no blood was apparent around or through the wrap. T. 47. Officer Blacksmith asked Farlee what happened to his arm. T. 49. Farlee responded that he had cut his arm on a wire panel fence outside of the Circle Bear trailer. T. 50. At the time of this exchange, Officer

---

[1] Any references to the suppression hearing transcript will be "T" followed by the page number or numbers.

Blacksmith was not aware that Eaton had been assaulted and had no reason to suspect Farlee of assaulting Eaton. T. 64.

Officer Blacksmith finished handcuffing Farlee and transported him first to the Eagle Butte Adult Detention Center and then to the Indian Health Services Hospital for treatment. T. 51-54. At the hospital, Farlee began acting up, pulling away from Officer Blacksmith and dropping down to his knees. T. 55. A nurse at the hospital told Officer Blacksmith that the hospital would not treat Farlee based on the way he was acting and that Officer Blacksmith should take Farlee back to the jail. T. 55. Farlee was taken back to the jail at that point, but later that day returned to the hospital for treatment. T. 56.

Sometime in the next day or two, Cheyenne River Sioux Tribal Detective Russell Leaf went to the Oakie trailer and observed evidence of blood coming down the outside front door and blood in the trailer's interior. T. 9. Detective Leaf determined that blood samples should be taken. T. 9. Detective Leaf called Leslie Oakie on the phone and received her oral consent to search her trailer, but Detective Leaf was out of town for training. T. 9; T. 11. After obtaining Oakie's oral consent to search her trailer, Detective Leaf called Detective Larry LeBeau around 11:00 a.m on the morning of April 3. T. 11; T. 30-32. Detective Leaf told Detective LeBeau that Oakie had consented to a search of her trailer and that Detective LeBeau should go to the house and take blood samples from the door and the windows. T. 11; T. 38. Detective LeBeau went to the Oakie trailer and collected blood swabs from its exterior. T. 32

Later on April 3, around 4:15 p.m., Detective LeBeau went back to Leslie Oakie's trailer. Doc 30-31. Shortly after Detective LeBeau arrived, Oakie and some of her family members returned home. T. 29-31. Oakie signed a consent form Detective LeBeau provided her that allowed him to

search and seize certain evidence from her trailer. T. 29-31; Doc. 22-5. Detective LeBeau then searched the interior of the trailer, took blood swabs from its interior, and seized a knife from inside the trailer. Doc. 18-19.

Meanwhile, Farlee was still in jail in Eagle Butte. Detective LeBeau applied for and received two tribal search warrants. The first warrant, issued on April 3, was to seize Farlee's boots, which jail personnel had collected upon Farlee's entry into the jail. Doc. 22-4 at 2. The second warrant, issued on April 4, was to gather a sample of Farlee's saliva. Doc. 22-5 at 2. Detective LeBeau submitted an affidavit in his application for each warrant. Doc. 22-4 at 1; Doc. 22-5 at 2. In support of the warrant for the boots, Detective LeBeau stated that "[t]he investigation revealed Leon D. Farlee . . . did assualt Merton Eaton with his fist and shod feet" and that "[t]he investigation revealed Mr. Leon D. Farlee at the time of the assault against Eaton was wearing a pair of brown western style (cowboy) boots." Doc 22-4 at 1. In support of the warrant for Farlee's saliva, LaBeau's affidavit states that the investigation led the officers to suspect Farlee and that Farlee's "boots did have a dark red substance on the both boots in the toe area that may be blood." Doc. 22-5 at 3. Detective LeBeau did not conduct the investigation he referenced in the affidavit, but drafted the affidavits based on what Detective Leaf had told him. T. 36. Judge Karen Jeffries of the Cheyenne River Sioux Tribe Children's Court signed both warrants. T. 36-38; Doc. 22-4 at 3; Doc. 22-5 at 2. Detective LeBeau testified that he handed Judge Jeffries the warrants and affidavits, she looked them over, and she signed them. T. 40. Based on these warrants, Detective LeBeau seized Farlee's boots and took buccal samples. T. 19-20; T. 25.

On April 10, 2012, a federal grand jury indicted Farlee with two counts of assaulting Eaton: one for assault with a dangerous weapon by use of shod feet and the other for assault resulting in

serious bodily injury. Doc. 7. Farlee moved to suppress his statements and the physical evidence seized by the tribal officers. Doc. 19. Judge Moreno, after the evidentiary hearing, issued a Report and Recommendation to deny the Motion to Suppress. Doc. 48.

### III. DISCUSSION

Farlee made five objections to the Report and Recommendation: (1) Farlee argues that the questioning by Officer Jeremi Blacksmith of Farlee was an interrogation for <u>Miranda</u> purposes; (2) Farlee argues that his statements to Officer Blacksmith were involuntary; (3) Farlee argues the validity of the consent obtained by tribal police officers to search the alleged crime scene; (4) Farlee argues that the search warrant was defective because it was conclusory and lacked detail; and (5) Farlee argues that, assuming there was an absence of probable cause supporting the warrant, the good faith exception to the warrant requirement does not apply. For the reasons explained below, the Report and Recommendation is adopted with qualifications.

#### A. Objection 1 - Initial Pre-<u>Miranda</u> Statement About the Arm Injury

Judge Moreno concluded that Farlee's statements to Officer Blacksmith about his arm injury were not the product of an interrogation and need not be suppressed for a failure to give <u>Miranda</u> warnings. Farlee objects to this conclusion.

The United States Supreme Court held in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), that any time a person is taken into custody for questioning they must be advised of their Fifth Amendment right to be free from self-incrimination in order "to counteract the 'inherently compelling pressures' of custodial interrogation." <u>Arizona v. Roberson</u>, 486 U.S. 675, 681 (1988) (quoting <u>Miranda</u>, 384 U.S. at 467). <u>Miranda</u> warnings are required prior to questioning "whenever a suspect is (1) interrogated (2) while in custody." <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990).

"Interrogation" is the "direct questioning [by a law enforcement officer] or any practice reasonably likely to evoke an incriminating response from a suspect." Griffin, 922 F.2d at 1347 (citing Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).

This Court adopts the Report and Recommendation on this matter because Blacksmith's questioning did not amount to an interrogation. Officer Blacksmith was not aware of the Eaton assault and was arresting Farlee at the time on a different matter. Officer Blacksmith was not interrogating Farlee when he asked Farlee what happened to his arm after Farlee asked Officer Blacksmith to watch out for the arm. Officer Blacksmith was not attempting to evoke an incriminating response, but trying to determine the nature and extent of Farlee's arm injury that Farlee brought to Officer Blacksmith's attention. Because Officer Blacksmith's inquiry was not an "interrogation" for Miranda purposes, no Miranda warnings were required. Farlee's statement about cutting his arm on a wire panel fence will not be suppressed under Miranda.

### B.     Objection 2 - Voluntariness

Farlee next argues that the statement made to Officer Blacksmith about his arm injury was involuntarily coerced and, therefore, inadmissible under the Fifth Amendment to the United States Constitution. The Fifth Amendment prohibits the use of involuntary statements at trial. See United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." Id. (quoting Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001)).

This Court adopts the Report and Recommendation on this issue because there was no coercive or overreaching police activity sufficient to render Farlee's statements involuntary. There

is no evidence that Officer Blacksmith did anything coercive when he arrested Farlee. Officer Blacksmith made no threats toward Farlee—a 39-year-old with a high school degree—that would impair Farlee's capacity for self-determination. Farlee called attention to his injury and Officer Blacksmith inquired as to its cause and severity to be in a better position to avoid further harming Farlee and to obtain any necessary treatment. Officer Blacksmith then took Farlee to the hospital. Farlee's statements were voluntary, and the Government has met its burden to show that the statements comported with due process requirements. Farlee's statements to Officer Blacksmith will not be suppressed.

### C.     Objection 3 - Validity of Consent to Search the Leslie Oakie Trailer

Farlee contests the validity of consent given by Oakie on two separate occasions to tribal police officers to search her trailer.[2] Farlee argues that consent was invalid because "[s]he was never advised that she could refuse [consent]." Doc. 51 at 2. Detective Leaf received Oakie's consent over the phone to search her premises. Detective Leaf then called Detective LeBeau and told him he had received Oakie's consent to search and that Detective LeBeau should go to the Oakie trailer and take

---

[2] Farlee may not have standing to challenge the search of Leslie Oakie's trailer. "The Fourth Amendment protects 'against unreasonable searches and seizures,' but its protections are personal and cannot be asserted by persons lacking a 'legitimate expectation of privacy' in the place searched." United States v. Kuenstler, 325 F.3d 1015, 1020 (8th Cir. 2003) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). A "casual visitor" to a home does not have a legitimate expectation of privacy sufficient to challenge the validity of a search of that home. United States v. Nabors, 761 F.2d 465, 468 (8th Cir. 1985). An overnight houseguest, however, has an "expectation of privacy in the home that society is prepared to recognize as reasonable." Minnesota v. Olson, 495 U.S. 91, 96-97 (1990). Whether Farlee has standing to challenge the search of the Oakie trailer was not addressed by the Government or Judge Moreno, the record is incomplete on the extent of Farlee's connection to the trailer, and the issue was not raised to this Court. The trailer was owned by Oakie. Nothing in the record at this time indicates that Farlee had a legitimate expectation of privacy in the Oakie trailer sufficient to challenge the validity of the trailer's search.

samples of the blood from the outside door and window. Detective LeBeau went to the residence around 11:00 a.m., on April 3, 2012, and took samples from the trailer's exterior. Detective LeBeau, later on April 3, met Oakie at her trailer, had her sign a consent form, and seized more evidence from inside the trailer. Oakie did not testify at the hearing.

The police may enter and search a person's house after receiving the voluntary consent of that person. United States v. Spotted Elk, 548 F.3d 641, 652 (8th Cir. 2008); see also Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). There is no requirement that the person giving consent be advised that she can refuse to give consent. United States v. Matlock, 415 U.S. 164, 167 n.1 (1974) ("[I]t is not essential for the prosecution [to] show that the consenter knew of the right to refuse consent in order to establish that the consent was voluntary."); see also Schneckloth, 412 U.S. at 227 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."). Oakie voluntarily gave her consent twice, once over the phone to Detective Leaf, and again when she signed the consent form provided by Detective LeBeau. Doc. 22-3. Farlee's objections to the validity of Oakie's consent are overruled. This Court adopts Judge Moreno's finding that Oakie's consent was voluntary and the searches and seizures subsequent to Oakie's consent were valid.

### D. Objection 4 - Sufficiency of the Probable Cause Affidavit

Judge Moreno concluded with some hesitation that the tribal search warrants that led to the seizure of Farlee's boots and saliva were validly based on probable cause set forth in the applications for those warrants. Farlee challenges this conclusion.

The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached judge; (2) contain a particular description of "the place to be searched, and the persons or things to be seized"; and (3) be based "upon probable cause, supported by Oath or affirmation." Dalia v. United States, 441 U.S. 238, 255 (1979); see also U.S. Const amend. IV. The third requirement for a valid warrant—probable cause based on an affirmation—is at issue here. "Probable cause exists, if under the totality of the circumstances, a showing of facts can be made sufficient to create a fair probability that evidence of a crime will be found in the place to be searched." United States v. Wallace, 550 F.3d 729, 732 (8th Cir. 2008) (citations and internal quotation marks omitted). When evaluating whether probable cause supported the issuance of a warrant, a court is to assess the "totality-of-the-circumstances" including the "'veracity' and 'basis of knowledge' of persons supplying hearsay information." Illinois v. Gates, 462 U.S. 213, 238-39 (1983). A reviewing court "is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. (quoting Jones v. United States, 362 U.S. 257, 271 (1960)). A court's review should be "flexible" and not "hypertechnical," but the affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause." Id. at 236, 239. And "wholly conclusory statement[s]" fail to meet this standard. Id. at 239.

Detective LeBeau submitted an affidavit on April 3, 2012, to a tribal court judge to obtain a search warrant to seize Farlee's boots, and a second affidavit on April 4, 2012, to obtain a search warrant for a saliva sample from Farlee. Doc. 22-4; Doc. 22-5. The entirety of the text of the affidavit supporting the search warrant for Farlee's boots was the following:

> On March 31, 2012 at 11:00 p.m. the C.R.S.T. Police Department responded to a 911 call of a male person with severe injuries lying on the floor unresponsive at the Leslie Oake [sic] residence located at the

> Tribal Trailer Courts on Sesame Street in Eagle Butte.
>
> During the investigation it was discovered the injured person was identified as Merton Eaton (62 years of age) who had multiple facial and head injuries requiring immediate medical attention. Merton Eaton was immediately flown by air craft [sic] to the Rapid City Regional Hospital and placed in intensive care for severe head injuries.
>
> The investigation revealed Leon D. Farlee (D.O.B.: 02-12-73) did assault Merton Eaton with his fist and feet causing life threatening serious bodily injury (head trauma) to Merton Eaton.
>
> The investigation revealed Mr. Leon D. Farlee at the time of the assault against Eaton was wearing a pair of brown colored western style (cowboy) boots significant with causing injury to Eaton which is in the possession of the C.R.S.T Adult Detention Facility after the arrest of Mr. Farlee that same night of the incident.

Doc.22-4 at 1. Detective LeBeau's second affidavit and application for a search warrant submitted on April 4, 2012, contained the same language, but included two more details. The second affidavit added information about a dark red substance, possibly blood, being found on the exterior of the door and window of the Leslie Oakie home where Eaton had been assaulted. Doc. 22-5 at 3. The second affidavit also stated that the pair of boots worn by Farlee had been confiscated and a "dark red substance on the [sic] both boots in the toe area that may be blood." Doc. 22-5 at 3.

The <u>Gates</u> Supreme Court decision guides the determination of when an affidavit is too conclusory to support issuance of a warrant. In <u>Gates</u>, the Court reviewed its jurisprudence as follows:

> Our earlier cases illustrate the limits beyond which a magistrate may not venture in issuing a warrant. A sworn statement of an affiant that "he has cause to suspect and does believe that" liquor illegally brought into the United States is located on certain premises will not do. <u>Nathanson v. United States</u>, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933). An affidavit must provide the magistrate with a

> substantial basis for determining the existence of probable cause, and
> the wholly conclusory statement at issue in Nathanson failed to meet
> this requirement. An officer's statement that "affiants have received
> reliable information from a credible person and believe" that heroin
> is stored in a home, is likewise inadequate. Aguilar v. Texas, 378
> U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). As in Nathanson,
> this is a mere conclusory statement that gives the magistrate virtually
> no basis at all for making a judgment regarding probable cause.
> Sufficient information must be presented to the magistrate to allow
> that official to determine probable cause; his action cannot be a mere
> ratification of the bare conclusions of others.

Gates, 462 U.S. at 239.

Both of Detective LeBeau's affidavits in support of the warrants state that an "investigation revealed" that Farlee assaulted Eaton with his fists and feet. Detective LeBeau's affidavits do not, directly or indirectly, provide any information by which a judge could discern how or why Farlee became a suspect.

An issuing judge "may draw reasonable inferences . . . in determining whether probable cause exists." Wallace, 550 F.3d at 732. After all, affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." United States v. Ventresca, 380 U.S. 102, 108 (1965). Here, the tribal judge could infer that the tribal police had knowledge that an assault resulting in serious bodily injury occurred based on the police responding to the call and involvement in transporting the victim Eaton for medical care. See Doc. 22-4. The first affidavit contains information by which the tribal court judge could discern the importance of seizing the shoes and the second affidavit would support obtaining a buccal swab saliva sample from a suspect. However, there is nothing in the affidavits for the warrants from which the tribal judge could infer how the tribal police came to identify Farlee as that suspect, other than the terse and conclusory statement that the "investigation revealed." Doc. 22-4; Doc. 22-5. The affidavits contained no information about

what investigation occurred to identify a suspect. These affidavits parallel closely the conclusory statements in cases where the Supreme Court has ruled statements insufficient to support a determination of probable cause. See Nathanson, 290 U.S. at 44 (holding affidavit insufficient to support probable cause when it stated the officer had "cause to suspect and does believe" illegal liquor had been brought by the defendant into United States); Giordenello v. United States, 357 U.S. 480, 481, 486 (1958) (holding that an affidavit that stated that a suspect "did receive, conceal, etc., narcotic drugs . . . with knowledge of unlawful importation" was insufficient because, among other reasons, it "it does not indicate any sources for the complainant's belief; and it does not set forth any other sufficient basis upon which a finding of probable cause could be made"); Aguilar, 378 U.S. at 115-16 (holding affidavit insufficient to support a probable cause determination when it stated that "[a]ffiants have received reliable information from a credible person and do believe" heroin to be in the suspect's home).

In recommending the warrants be upheld, Judge Moreno stated "although not completely free from doubt or debate, LeBeau's affidavits provided sufficiently reliable information" because the issuing judge could reasonably infer that the investigating officers obtained their information through reliable sources. Doc. 48 at 13. Judge Moreno cited to a few cases where search warrants were found to have detailed enough facts to support a probable cause determination. Doc. 48 at 13 n.35. In each of these cases, the affidavits contained some greater explanation of factual information gained in the investigation than did Detective LeBeau's affidavit. See United States v. Reed, 700 F.2d 638, 641-42, 641 n.1 (11th Cir. 1983) (upholding probable cause determination because the affidavit thoroughly described the facts gathered in the investigation and the facts gathered were based upon the affiant's personal observation or observation of fellow officials); State v. Willits, 413

So.2d 791, 792-93, 795 (Fla. Dist. Ct. App. 1982) (upholding probable cause determination when affidavit furnished an "abundance of detail" about facts gathered in an investigation and "the affiant or his sources came about their information in a reliable way"); State v. Jaroma, 514 A.2d 1274, 1278 (N.H. 1986) (upholding probable cause determination after an investigation of a check-kiting scheme when a citizen eyewitness gave evidence and the police listed specific facts gathered from the investigation).

Unlike in Reed, Willits, and Jaroma, Detective LeBeau's affidavits contained no information to connect Farlee to the assault of Eaton other than the bald statement that it was what the "investigation revealed." If there had been some information in the affidavit as to how the investigation so revealed—whether by Farlee being found there, the victim blaming Farlee, some eyewitness to the assault, someone seeing Farlee and the victim together close in time to the assault, or some statement or admission attributable to Farlee—the result would be to adopt Judge Moreno's recommendation. However, Detective LeBeau's affidavits contained no such information, so the warrants should not have been issued by the tribal judge without further inquiry or information on why Farlee was the suspect in the assault.

### 5. Objection 5 - Whether the Leon Good Faith Exception Should Apply

Judge Moreno recommended that even if the warrant was found to lack probable cause, the evidence need not be suppressed because of the applicability of the good-faith exception to the Fourth Amendment warrant requirement as set forth by United States v. Leon, 468 U.S. 897 (1984) and its progeny. Doc 48 at 14. Farlee objected to this conclusion. Doc. 51.

When violations of the warrant requirement occur, the Exclusionary Rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its

deterrent effect, rather than a personal constitutional right of the party aggrieved." Leon, 468 U.S. at 906. In Leon, the Supreme Court articulated a good-faith exception to the Exclusionary Rule. Id. at 922. Under the exception, the Exclusionary Rule is not to "be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral magistrate judge's determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid." United States v. Taylor, 119 F.3d 625, 629 (8th Cir. 1997) (citing Leon, 468 U.S. at 905, 922); see also United States v. Gipp, 147 F.3d 680, 688 (8th Cir. 1998) (applying the Leon good-faith exception to a tribal search warrant). The Supreme Court explained the rationale behind the good-faith exception in this manner:

> It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

Leon, 468 U.S. at 921 (internal quotation and citation omitted).

"The Exclusionary Rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." Id. at 916. "[S]uppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." United States v. Hessman, 369 F.3d 1016, 1021 (8th Cir. 2004) (citing Leon, 468 U.S. at 918). The good-faith exception does not exclude evidence when an officer's reliance on a warrant issued by a judge or magistrate is

objectively reasonable. Leon, 368 U.S. at 922. An officer's reliance is not objectively reasonable, and the good-faith exception does not apply, in four circumstances: (1) when the issuing judge is misled by information that is false or made in reckless disregard for the truth; (2) when the issuing judge completely abandons her judicial role; (3) when the information provided to the judge includes so little indicia of probable cause that the officer's belief in its existence is entirely unreasonable; and (4) when the warrant is so facially deficient, i.e., in failing to particularize the place to be searched or the things to be seized, that the executing officer cannot reasonably presume it to be valid. Id. at 923; see also Hessman, 369 F.3d at 1020 (noting these four situations).

Farlee appears to be arguing that either the second or third circumstance justifies refusal to apply the good-faith exception. See Doc. 51 at 3 (arguing that the police officer should not be saved by his own "bumbling," but not alleging that the police officer misled the issuing judge or failed to identify the place to be searched or things to be seized). Under the second exception, the issuing judge abandons her judicial role when she serves as a mere "rubber stamp" or an "adjunct law enforcement officer." Leon, 468 U.S. at 914. The Fourth Amendment's warrant requirement ensures that there is a neutral and detached magistrate who makes a probable cause determination and stands between the citizens and the officers who are "engaged in the often competitive enterprise of ferreting out crime." Johnson v. United States, 333 U.S. 10, 14 (1948). For example, one way an issuing judge acts as a rubber stamp is when the affidavit lacks probable cause and the judge issues the warrant without question or hesitation. See United States v. Swift, 720 F. Supp. 2d 1048,

1058-59 (E.D. Ark. 2010) (suppressing evidence when a blanket affidavit contained boilerplate allowing car searches at a house, no probable cause to search cars existed, and the judge signed the warrant "without question or hesitation").

Here, the issuing judge signed both warrants after she read the affidavits submitted by Detective LeBeau. Although probable cause did not exist based on the terse and conclusory nature of the affidavits, this Court cannot conclude Judge Jeffries abandoned her judicial role. Both the issuing judge and Judge Moreno believed the information contained in the affidavits were sufficiently reliable upon which to base a probable cause determination. Whether probable cause existed based on the affidavits to justify the issuance of these warrants is not an easy determination. The issuing judge should have been more demanding of the affiant, inquired into the basis for the conclusory assertions in the affidavits, and required more facts before issuing the warrants. But the issuing judge did not abandon her judicial role by approving these warrants under the circumstances of this case. Cf. Swift, 720 F. Supp. 2d at 1058-59.

Under the third circumstance listed in Leon for refusal to apply the good-faith exception, "[e]vidence should be suppressed only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause." United States v. Gibson, 928 F.2d 250, 254 (8th Cir. 1991) (citing Leon, 468 U.S. at 921-23). The Leon inquiry "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of all of the circumstances. Leon, 468 U.S. at 922 n.23. This rule was not

fashioned to provide incentives for detectives to write better search warrants, but "to deter unlawful police conduct" by suppressing evidence gained from a search the officer knew to be unconstitutional. Id. at 918-19.

In this case, Detective LeBeau based his affidavits on information relayed to him by Detective Leaf. Detective Leaf had begun the investigation and had information to reasonably suspect that Farlee assaulted Eaton. Detective LeBeau, at the request of Detective Leaf, collected blood samples and seized a knife from the alleged crime scene. Detective LeBeau could and should have provided more facts in his affidavit seeking the search warrants. But under the circumstances, Detective LeBeau had an objectively reasonable belief in the existence of probable cause that Farlee assaulted Eaton and that the search warrants should have been issued.

Thus, this is not one of those "unusual cases in which exclusion will further the purposes of the exclusionary rule" because the judge did not completely abandon her judicial role and the search was not objectively unconstitutional. Leon, 468 U.S. at 918. This Court adopts Judge Moreno's Report and Recommendation in refusing to suppress the physical evidence because the good faith exception to the warrant requirement applies.

## III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the Report and Recommendation, Doc. 48, is adopted in part by this Court. It is further

ORDERED that the Defendant's Objections, Doc. 51, to the Report and Recommendation are overruled except for the objection to whether there was sufficient probable cause set forth in the affidavit and application for the search warrant. Finally, it is hereby

ORDERED that the Motion to Suppress, Doc. 19, is denied.

Dated December 7, 2012.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE